ADAM GORDON
United States Attorney
AMANDA L. GRIFFITH
Assistant United States Attorney
California Bar No. 243854
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101
Telephone: (619) 546-8970
Email: mandy.griffith@usdoj.gov

STEVEN J. GROCKI
Chief, Child Exploitation and Obscenity Section
U.S. Department of Justice, Criminal Division
KYLE P. REYNOLDS
Acting Deputy Chief
New York Bar No. 4703856
1301 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 616-2842
Email: kyle.reynolds@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAMES DAVID JOHNSON,<br><br>Defendant. | Case No. 25CR76-BAS<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Sentencing Date: September 11, 2026<br>Time: 10:00 a.m. |

James David Johnson pleaded guilty to distributing child pornography. His offense conduct was egregious—far more egregious than that of the ordinary child pornography offender, or even the ordinary child pornography distributor. Over the course of multiple

years, he distributed massive amounts of child pornography over at least five different dark-web websites dedicated to child sexual abuse. He rose through the ranks to become a high-level administrator on one of these websites, which prominently featured "hurtcore"—a genre of child pornography depicting children being subject to pain, humiliation, and distress. He provided advice to his fellow offenders about how to evade detection from law enforcement. The child pornography he distributed on these websites and possessed on his own personal devices includes some of the worst content imaginable, including depictions of the sexual abuse of infants, bondage, and deceased children. And he committed these offenses from a religious institution where he worked.

Based on the totality of Johnson's conduct and his personal history, the United States recommends a sentence of 188 months in prison, followed by twenty years of supervised release.

### A. Offense Conduct[1]

The PSR contains a basic overview of Johnson's online criminal activities and his sexual interest in children. It accurately details that Johnson was a member of a dark-web website dedicated to child pornography and that on one occasion he used that website to share a video depicting the sexual abuse of a young child. PSR ¶¶ 5-7.

But the PSR does not fully convey the full extent of Johnson's online conduct. Over the course of at least three years, Johnson was a member of no fewer than five dark-web communities dedicated to child pornography and the sexual abuse of young children. These websites are referred to in the warrant affidavits as "Website-1," "Website-2," "Website-3," "Website-4," and "Website-5." PSR ¶ 18. These websites were not just places to acquire child pornography. They were flourishing communities where offenders could come together, discuss their interests, share information, provide advice on how to avoid law enforcement, and normalize one another's sexual desire for young children. And they all

---

[1] The offense conduct comes from the PSR, discovery (specifically, affidavits submitted during the investigation), and information provided during the detention hearing held on December 19, 2024. ECF 12.

operated using technology designed to allow themselves to engage in these activities openly but anonymously, and with a measure of assurance that their identities would not be discovered.

Johnson was not a casual or lukewarm user of these websites. Instead, he used each of them to advertise and distribute large quantities of child pornography and to discuss topics relating to child sexual abuse. In October 2021, for example, he stated over Website-1 that he had distributed nearly 7.5 gigabytes of child pornography over the site so far, and he continued distributing child pornography over Website-1 for approximately another year. He made more than 950 posts on Website-2, and he was such a valuable contributor that he was selected to be a high-ranking staff member who helped run the website. Website-2, which Johnson helped run, boasted outright that it permitted "hurtcore," which included "photos and videos where children cry and are forced to have sex against their will," as well as material depicting "blackmail" or "gore/necrophilia." On Website-2, Johnson shared videos depicting the sexual abuse of children he admitted were "babies" who were in an "unhappy" state—presumably because the videos depicted an adult man using his penis to penetrate the mouths and anuses of two infants.

Consistent with the theme of Website-2, Johnson's online conduct also reflects a particular interest in very young children—including infants—and children being subject to pain and suffering. Johnson continued sharing similar content over other websites, including Website-4, on which he shared a video of what he described as an infant less than two months old being subject to anal penetration by an adult man's penis. Johnson shared this video with a positive comment about the perpetrator in the video "stretch[ing]" the infant and also announced that the video audibly depicted the infant victim "crying." He also made dozens of posts on Website-5, including posts regarding "snuff," which refers to depictions of death.

When he distributed child pornography over these websites, Johnson used unique usernames and an identifying banner that reinforced his brand. Each of these banners depicted children's faces. Johnson also used profile pictures on these websites, including a

profile picture on Website-5 that depicted a nude toddler bound with ropes that were rigged in such a way to force her legs apart and expose her naked genitals to the camera.

Johnson did not just share child pornography over these websites; he counseled other users on how to commit crimes while remaining undetected and even provided advice on evidence that could be left behind after the sexual abuse of a child. For example, on Website-4, he advised other users to use a particular operating system that does not save artifacts, and also how to configure their access to the dark web to provide even greater anonymity. On Website-5 he told another user, "Just so you know, if you have any contact, even with a condom, you will leave epithelial tissue, which any first world forensics team could recover. I'm afraid, currently, the only method would require removing the evidence physically from existence. (Or move to where a first world forensics team would not affect you.)"

Generally speaking, Johnson did not access these websites and engage in criminal activity from his home. Instead, he committed these offenses from a religious institution, where he worked without pay as an audio and visual technician. PSR ¶¶ 10, 81. This position gave him regular and all-hours access to the religious institution's internet account, which—unbeknownst to the clergy and worshippers there—he used to access these websites and share child pornography. By doing this, he put the other members of this religious institution at risk of law enforcement action, reputational harm, potential liability, and other negative consequences.

This risk manifested in December 2024, when the FBI executed search warrants at this religious institution and at Johnson's home. PSR ¶¶ 10-11. Through these various warrants, FBI agents seized multiple computer devices belonging to Johnson that contained more than 260,000 images and videos of apparent child sexual abuse and exploitation. *Id.* ¶ 13.

The contents of Johnson's devices confirm his particular sexual interest in infants, toddlers, and depictions of children being subject to bondage and even death. More than 7,000 videos on his devices depicted the sexual abuse of infants and toddlers or children

being subjected to bondage. PSR ¶ 14. Other images and videos on his devices depicted dead children—including dead babies—in autopsy photos. One photo showed a close-up of a deceased child's vagina and anal cavity. *Id.* ¶¶ 14-15. Based on the contents of his devices, including crime scene photos, Johnson appeared to have a particular interest in six-year-old murder victim JonBenét Ramsey. *Id.* ¶ 16.

While the investigation did not uncover evidence of Johnson's hands-on sexual abuse of a real child, it uncovered abundant indications of extremely alarming behavior by Johnson. For example, his devices also included non-sexual photos he appears to have taken of a young girl in the religious institution where he worked, photos of him alone with young female family members, and hundreds of photos of young girls in bathing suits that appear to have been taken at a local swimming competition. PSR ¶¶ 13, 17.

Johnson's devices also contained multiple copies of guides that provide technical advice on how to meet, groom, and sexually abuse children, including how to penetrate children of different ages without harming them. *See, e.g.,* PSR ¶ 13.

Lastly, Johnson's sexual interest in children did not exist only in the online world. Two items were discovered during the execution of the search warrant at his residence, which evidence that his interest took form in the real world. *See* Exhibit A.[2]

### B. <u>Special Assessments</u>

Consistent with the plea agreement, the United States is recommending Johnson pay the $100 special assessment but asking the Court not to impose the other special assessments. The United States believes that Johnson's obligation to pay restitution should be prioritized over the JTVA and AVAA special assessments.

### C. <u>Restitution</u>

The Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 (AVAA) was enacted on December 7, 2018. The AVAA created new penalties and made a number of changes to existing child pornography laws including restitution. Specifically,

---

[2] These photographs were provided to the Court and defense counsel as part of the United States's proffer during the detention hearing.

the law provides that restitution must be ordered for all "child pornography trafficking offenses" of no less than $3,000 per victim. The amount of restitution ordered is not dependent on a defendant's ability to pay. Instead, it is based upon a court's determination of the "full amount" of losses incurred by a victim as a result of the trafficking in child pornography depicting the victim. 18 U.S.C. § 2259(b)(2). The term "full amount of the victim's losses" includes any costs incurred, or that are reasonably projected to be incurred in the future, by the victim, as a proximate result of the offenses involving the victim; and in the case of trafficking in child pornography offenses, as a proximate result of all trafficking in child pornography offenses involving the same victim, including:

- medical services relating to physical, psychiatric, or psychological care;
- physical and occupational therapy or rehabilitation;
- necessary transportation, temporary housing, and child care expenses;
- lost income;
- reasonable attorneys' fees, as well as other costs incurred; and
- any other relevant losses incurred by the victim.

18 U.S.C. § 2259(c)(2)(A)-(F).

The United States has received more than 45 requests for restitution to date. Consistent with the AVAA, the United States is seeking the mandatory minimum amount required for each victim for a total of $135,000. The requests, along with a proposed restitution order, were sent to Defendant. As of the filing of this sentencing memorandum, Defendant has not noted any objection to the proposed restitution order or to the individual requests made by the victims. A copy of the proposed restitution order will be submitted to the Court ahead of the sentencing hearing.

**C. <u>Guidelines Calculation</u>**

The guidelines calculations are detailed in the plea agreement and will be filed separately in a sentencing summary chart. The United States does not dispute these calculations.

The United States notes that in the Plea Agreement, it took the position that Johnson should receive a five-level enhancement under U.S.S.G. § 2G2.2(b)(3)(B) because he distributed in exchange for valuable but non-pecuniary consideration. For example, on Website-1, Johnson sent the website administrator a message indicating that he had uploaded nearly 7.5 gigabytes of child pornography and that he should be allowed into a particular room on Website-1 that contained additional child pornography. Approximately one month later, the leadership of Website-1 granted him access to that room. In addition, Johnson posted so much child pornography to Website-2 that he was selected to serve as a high-ranking staff member.

The PSR does not apply this enhancement, and it instead applies only a two-level enhancement under U.S.S.G. § 2G2.2(b)(3)(F) for distribution not in exchange for anything of value. The United States maintains that Johnson did distribute child pornography in exchange for valuable but non-pecuniary consideration on numerous websites, including Website-1 and Website-2.

The specific conduct identified in the Plea Agreement and the Criminal Information, however, took place over Website-5. Accordingly, to avoid needless litigation over the scope of relevant conduct, or whether Johnson's conduct on other websites amounted to a clear pattern and practice of distributing child pornography in exchange for valuable non-pecuniary consideration in general, the United States does not object to the PSR's calculation of the guidelines range and instead relies on the 18 U.S.C. § 3553(a) factors for a sentence at the high end of that range.

**D. <u>Government's Sentencing Recommendation</u>**

The United States recommends a sentence of 188 months, which, as noted, is at the high end of the advisory guidelines range. It does so not to minimize Johnson's acceptance of responsibility, which was prompt and full. Instead, such a sentence would reflect Johnson's dangerousness to the community and his relative culpability, which is much, much greater than the vast majority of child pornography traffickers.

Johnson's guidelines range of 151-188 months is calculated under U.S.S.G. § 2G2.2, which is often criticized for producing artificially high ranges. In some cases, that criticism may well be valid.

Here it is not. Johnson's guidelines range is high because of his egregious offense conduct, not because of some deficiency in the guideline. Johnson did not just consume or download child pornography, as so many other defendants do—although that would be bad enough. Instead, over the course of years, he ingratiated himself into one child-exploitation community after another. Once he became a member of these communities, he advertised and distributed child pornography to his fellow pedophiles on a mammoth scale. The images and videos that Johnson shared online—coupled with the hundreds of thousands he maintained on his personal devices—strongly suggest that he has a particular sexual interest in infants and toddlers and is riveted by depictions of children being subject to pain and death.

Indeed, there is reason to believe that for an offender like Johnson, § 2G2.2 may even *understate* his culpability. This idea is endorsed by the Sentencing Commission. In its 2012 Report to Congress, the Commission identified participation in online child pornography communities as one of the most significant factors that should be considered in imposing sentences on child pornography trafficking defendants, but which has not been incorporated into § 2G2.2. United States Sentencing Commission, *2012 Report to the Congress: Federal Child Pornography Offenses*, at xvii-xviii (December 2012) ("2012 Report").[3]

With respect to these child pornography communities, the Commission concluded that their existence "increases the likelihood that *other* community members may engage in sex offending to create new child pornography images for trading online." 2012 Report at 94. It found that such communities are also dangerous because they normalize the sexual

---

[3] The full report is available at https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (last visited August 31, 2026).

exploitation of children, help offenders look at their deviant sexual desires in a positive light, and may lead offenders to progressing from viewing child pornography to committing other sex offenses. *Id.* at 97. The 2012 Report suggested that not accounting for child-exploitation communities could result in Guidelines ranges that are "***unduly lenient***." *Id.* at xviii, 321 (emphasis added).

But Johnson did not merely participate in one child-exploitation community; he participated in at least five. And he was not a mere rank-and-file participant in all of them. In particular, he rose through the ranks to become a high-level staff member who helped to run Website-2.

The guidelines range likewise fails to account for Johnson's sophistication as an offender. As noted above, the websites he patronized used sophisticated technology to mask the identities of their users. He counselled other offenders online on how to use technology to even further evade detection by law enforcement. And he committed his offenses from the religious institution where he worked, which he doubtlessly considered a safer location than his home.

Some offenders who derive sexual amusement from watching children in pain and distress were themselves subjected to abusive conduct in their childhoods or otherwise suffer from significant mental-health conditions. Johnson apparently cannot say the same. He reported no childhood abuse or psychological issues that could even explain, much less excuse, his criminal behavior and deep sexual interest in children. PSR ¶¶ 62, 69.

Johnson has no prior convictions, but it is not accurate to say that he has no criminal history. Instead, he engaged in criminal activity continuously for years on end. He did so using technology and techniques that made him more difficult to detect and identify. And he stopped his criminal conduct only when FBI identified and arrested him.

For all these reasons, a 188-month sentence is sufficient but not greater than necessary in light of all the factors under 18 U.S.C. § 3553(a), particularly the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law,

to provide just punishment, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

**E. <u>Criminal Forfeiture</u>**

The parties have agreed to forfeiture pursuant to the plea agreement, and the Court has already signed the preliminary order of forfeiture. Dkt. 45. The United States asks the Court to include forfeiture on the record as part of the sentencing hearing, and a final order of forfeiture will be provided separately for to the Court.

**F. <u>Conclusion</u>**

For the reasons set forth herein and consistent with the plea agreement, the United States recommends a sentence of 188 months in custody, followed by twenty years of supervised release.

Date: September 4, 2026

Respectfully submitted,

ADAM GORDON
United States Attorney

*<u>/s/ Amanda L. Griffith</u>*
AMANDA L. GRIFFITH
Assistant U.S. Attorney

*<u>/s/ Kyle P. Reynolds</u>*
KYLE P. REYNOLDS
Acting Deputy Chief